Good morning, Your Honors, Counsel, and may it please the Court, my name is Michael Gomez on behalf of both Jorge Marcial and Mario Marcial, and I'd like to reserve two minutes for rebuttal, and I'll keep an eye on the clock. Border Patrol Agent Richard Otero stopped the Marcial's Honda Pilot based on common behaviors that countless California freeway drivers engage in, which is slowing down upon spotting law enforcement perched on the side of the road, driving at a lawful speed, even in the fast lane, and going across three lanes of traffic without signaling, and then being blocked by a truck, that's pretty dangerous driving, I would think that's enough to get you pulled over just for that, isn't it? Well, a couple of points, Your Honor, first, Agent Otero was a Border Patrol agent, so he said he would not have pulled over a car just for a traffic violation, as that's not in his authority. Is that relevant for Fourth Amendment purposes? I thought, oh, the Fourth Amendment requires probable cause or reasonable suspicion for a traffic stop of an offense, does it matter whether or not the officer has authority under some other statute, or is that relevant to the Fourth Amendment? Yes, Your Honor, in this particular case, Agent Otero only ever suspected the Marcial's of vehicular drug trafficking, not of any traffic violation, and the offense here wouldn't have been cutting across a few lanes of traffic without signaling. The offense here that he stopped them for was a suspicion of vehicular drug trafficking, and this came after eight miles of pursuit, this wasn't, you know, immediately upon being followed by Agent Otero, Agent Otero followed them for eight miles on I-15, and in the... Yeah, but during that, while they were being followed, he learned about their prior record. These people had attempted to smuggle marijuana across the border on a number of occasions, they had attempted to cross the border in the past in a stolen vehicle, and so I believe it's four occasions, but don't hold me to it, where they were, they attempted to actually smuggle drugs across the border. Yeah, I wouldn't, that combined, I forget about whether, you know, reasonable suspicion is not a very high standard, it's that probable cause is less than more likely than not, so it's less than that, so when you combine that with what Judge Collins referred to, it seems to me, in terms of the stop, whether there was reasonable suspicion, it's fairly open and shut. Well, you're right, it's important to look at what's missing, you know, saying that they had smuggled marijuana, attempted to smuggle marijuana across the border, it's a reductive explanation for what actually happened, which were border crossings on foot with small amounts of marijuana, and these happened in 2010, 2014, and 2011, so those are the three incidents regarding the marijuana arson. I think there's one on April 10th, 2019. That was, that was where Mario was, that was the incident involving crossing a border with a stolen vehicle, which didn't lead to any arrest or conviction, and in this case, Officer Otero learned that the car was properly registered to one of the occupants in the car, which is Mario Marcial, so that wasn't reasonable suspicion that they were engaged in vehicular drug trafficking, so to jump from crossing the border on foot with small amounts of marijuana, making that leap to, I'm sorry, to vehicular drug trafficking with manipulated compartments in a car. Does the record indicate, when they were told this, when they checked up on the car, does it indicate that it was small amounts of marijuana when they were stopped? Did, I'm sorry, did what indicate, what were the indications? The record, the record, you just said that these were small amounts of marijuana that they were attempting to smuggle. This record in 2010, 2014, and 2011, so first, Agent Otero's... In other words, what were the agents told when they, they're following this car and they decide to check on it, they have this whole, all of this information, which would certainly make one suspicious, particularly taken, taken into, taken together with the facts to which Judge Collins referred in his question. Yes, sir, so in Agent Otero's arrest report, he did say that the record search that he conducted on his DHS laptop revealed, quote, unquote, derogatory information. In his declaration, he gave some more details where he said that they had attempted to smuggle marijuana, and then at the suppression hearing, he said that at least some of these incidents occurred on foot as they attempted to walk across the border. Well, what is that? But you, but your point is that it was a small amount that was, that was for personal use? That, oh, so that goes to the second issue. That's what I'm asking. In other words, what did they know at the time? Okay, those are, those are two separate issues about the personal use amount of marijuana that they... Oh, but you just described that they knew it could have been anything. It could be, and it could have been any amount. So they, they, they know that these people are, are, are potentially, you know, worth stopping, particularly, particularly given the, the, you know, the circumstances. I, I, I, I'll stop. Well, Your Honor, I would just like to point out that what was, setting this precedent, allowing an officer to rely on a years-old, fundamentally dissimilar incident as used to support reasonable suspicion of something, that is extreme, an extreme step up from just crossing the border. But isn't this dissimilar to what? You said dissimilar, dissimilar, it's ultimately dissimilar to what they were actually doing, which is that they graduated to more and more significant stuff. But I don't know what you mean by dissimilar. Right, and the, the point, Your Honor, is that there is no, Agent Otero did not offer any information as to, or any reasonable or logical explanation as to why someone with, you know, up to 10 years, 10 and 12-year-old incidents of crossing the border on foot with small amounts of marijuana to vehicular drug trafficking 10 or 12 years later, there's nothing to account for that giant leap. But that isn't, I mean, isn't that exactly what the Supreme Court told us not to do in our vizu? I mean, you've got a bunch of factors, you know, maybe none of them is compelling by itself. But, I mean, it's really relevant in the sense that, you know, in the class of people who have in the past been caught at the border with marijuana, even in small quantities, you are more likely to find drug traffickers in that group of people than in, you know, the population at large. And, you know, when you combine that with, you know, the erratic driving that Judge Collins described and, you know, some of the other factors, you know, none of them might be, you know, all that significant by themselves, but we have to look at them all together, right? So, does it per vizu require us to do that? Certainly, Your Honor, this Court looks at the totality of the circumstances, but that does not relieve this Court of its obligation to look at the individual factors and weigh their probative value. And in this case, we have these factors, which this Court will consider in totality, but each one of those factors, the probative value of those factors is minimal, Your Honor. A lot of these are indicative of innocent conduct. And then when we have not erratic driving, a partner, Marcel, the driver drove at unlawful speed in a single lane of traffic for over eight miles and at one exit attempted to exit and cross three lanes of traffic without signaling. We also have those incidents before, the prior incidents with small amounts of marijuana. We also have this incredible testimony about the artificial mud that Agent Montero allegedly saw on the car. And all of those individually, when you add them together, it still does not amount to reasonable suspicion of drug trafficking. And that's the only offense that Agent Montero ever suspected them of committing. And, Your Honor, I see that my time is running out. I'd like to reserve the rest of my time for the Plaintiff. Okay, so, Mr. Escalante. You're muted. You warned me about that. Good morning, Your Honors. May it please the Court, Ruben Escalante on behalf of the United States. Your Honors, the first issue is the initial stop. It's the totality of the circumstances analysis. And here, with respect to reasonable suspicion. Your Honor, the factors pile up. Here we have an agent with 19 years of experience within 70 miles of the border on the I-15, what he referred to as a smuggling corridor. We see the car that slows in response to his presence. He testified it was the only car that did that up to the point that day, in addition to the other two cars that were in the same package. He also testified that the car was going, quote, super slow, end quote, 60 miles per hour on the I-15 fast lane freeway. That's 20% slower than traffic. There was also swerving, which the Court found. He also testified to the spray on mud, which the Court made a credibility finding and determined that the speed was not bad at all. Why isn't that? Tell me why you think that finding is not clearly erroneous. You know, you look at the pictures, and then you think about the type of vehicle he was in and the type of vehicle he was observing, and the fact that he said it wasn't mud on the bumper. How could he possibly have seen the undercarriage of the vehicle to see that it had spray on mud? Yeah, yes, Your Honor. Yes, Your Honor. I don't know whether it's geometry, physics, or common sense, but in this case, the testimony was that he saw it. So if we look at that picture, which is ER, it's lost on me, Your Honor. ER, where it showed the back of the picture, is from approximately, we'll say, four feet. Your Honor, if you take a couple of steps back, just visually in our mind, you'd start to see more of the underneath of the car. Also in that picture, Your Honor, there's no spare tires. But we, I mean, there's no tire. Sorry. You can't see the tires. But we know if we took a couple steps back, we would see the tires. We know from just driving on the freeway that if you took a couple steps back, you would start to see the muffler. And if you're far enough back, you would start to see the undercarriage of the car. And that's what he testified to, Your Honor, was that he saw the undercarriage of the car and he saw the spray on mud on the undercarriage of the car. So the fact that that picture, which was at a certain distance to and from, does not make it clearly erroneous that from more feet back, from more car lengths back, that he would have seen the undercarriage of the car and that spray mud. And Your Honor, the court weighed that, heard that same testimony, saw that same picture, and determined that he did see the undercarriage of the car and the spray on mud, Your Honor. Going down the other facts, Agent Otero knew that he'd just crossed the border. He ran details on the individuals who crossed the border and determined that they had previous smuggling incidents. And then, as Your Honor pointed out, this wasn't just a slow progression. This was a cut across of the entire freeway with no signal. The court found, dangerously, only to be stopped by a tracker trailer. My colleague testified it was just one exit. Well, Your Honor, this was the last exit before the border checkpoint. So Agent Otero, looking at all those facts, determined he's trying to get away from me. He knew that that was consistent, all those things that I mentioned, consistent with what he has experienced on that freeway, what he has experienced in his career as a Border Patrol agent, that it was consistent with drug smuggling. And that's why you pulled him over. And that's why... Professionally, were there recollections of Otero's vehicle marked to indicate that it was a government vehicle, law enforcement vehicle? Your Honor, there were no big markings on it like CHP or that green stripe. But in this case, there were markings like canine vehicle. He was parked perpendicular to the freeway, indicating, I'm here for law enforcement purpose. And, Your Honor, the court found that he was visible to the population on the freeway. So, Your Honor, that slow reaction was an indication that the drivers knew that he was law enforcement. And, Your Honor, that gets us to the second issue that counsel has raised in the briefing, and that's the length of the investigation. So Agent Otero pulls over this car because he believes drug smuggling is going on. So all he needed was reasonable suspicion to continue that investigation under Rodriguez. Every step he took was tied to an investigation for a smuggling event. Within minutes, the driver, George Marseille, admits to marijuana being in the car, nothing about personal use. He claims he's headed to Long Beach, claims he's headed to Long Beach on the worst possible freeway to get to Long Beach, the I-15. And, Your Honors, he points his finger to the person in the car. He claims it was Mario Marseille who told him to take the I-15. So the next logical step in this drug investigation is to go talk to the other witness in the car, Mario Marseille. Within minutes, Mario Marseille admits to there being drugs in the car. At that time, nothing, an initial statement, nothing about personal use, and then he tried to walk back the claim, his admission, and say it was about personal use. He also claims he's headed to Long Beach, again, on the worst possible freeway possible, and he points the finger to his cousin, George, and says it's because he didn't have a driver's license, so he wanted to avoid the Border Patrol and the I-5. This is what Agent Otero testified to. But, Your Honors, one more thing that makes this story incredible about being on the I-15 and trying to avoid Border Patrol is there's a Border Patrol checkpoint on the I-15, and Agent Otero just witnessed the driver attempt to exit the freeway at the last minute in a dangerous fashion to try to evade him to, guess what, get off the freeway before he passed that Border Patrol checkpoint. So, Agent Otero rejected the innocent explanations about being on the worst freeway going to Long Beach. He rejected any innocent statements about potentially there just being personal use marijuana in the car, and he concluded, and he thought they were lying, and under Westby, he's entitled to do that. Under Westby, he's entitled to infer a guilty mind. So, based on everything he knew up to that point, the border crossing, the spray on mud, the innocent driving the wrong freeway, the inconsistent stories, he determined drug smuggling was happening. The court found they admitted to marijuana being in the car. The courts find he did not limit it to personal use amounts either. This justified continuing the stop, and within minutes, what had started as reasonable suspicion ripened to probable cause. And, Your Honor, that gets us to the last issue, probable cause. Your Honor, there's no search up to this point. At the time that George and Mario Marcel admitted there being drugs in the car. Now, defendant claims that the first time a search was done was when Agent Otero touched the back of the car to verify that there was spray on mud back there. This is at his appellate reply brief, page 24. If that's the case, it would require two things to get Agent Otero to lawfully touch the back of the car, consent or probable cause. Agent Otero testified that they consented to the touch, but let's assume that there's no consent for right now. There is probable cause based on everything up to this point. All the circumstances, there's a fair probability that contraband or evidence of the crime will be found in that place. The border crossing, the spray on mud, the evasive driving, the being on the wrong freeway, the admission to drugs, the lying to the agent. At the very least, Your Honor, it's justified touching the car. And once Agent Otero touched the car, he verified there was spray on mud, artificial spray on mud. So that's even more probable cause. Then he took it to the lift station. A dog alerted to the gas tank, even more probable cause. Then they had a density tool on the gas tank, even more probable cause. And a scope was put in the gas tank to see the drugs, even more probable cause. And then they pulled out the drugs. Now, Your Honors, regarding consent, the court found that they, quote, allowed, end quote, to put it on the lift. This supports that there was consent, Your Honor. Your Honor, for those reasons that the government would ask this court to affirm the trial court's ruling, I'm, of course, at your service to answer any additional questions. Could I ask one question, Your Honor, out of curiosity? These people were driving without a license. Yes. For some reason, you didn't mention. I don't know enough about California. Is that a violation of California law? To drive a car without a license? Yes, Your Honor, but I do want to point two things out. Is one, I don't think the record reflects that he knew they didn't have a license before he pulled them over. Once he pulled them over. No, no, no, no, but afterwards he knew. Yes, Your Honor, afterwards he knew. But I believe there was something in the record, perhaps it was a PSR, that indicated one of them objectively had a license, even though he didn't have it that day. So that may have been why Agent Otero did not make a big adieu about them not having a physical license that day. But that wasn't teased out on the record below, Your Honor. Your Honor, there is one more point, if I have extra time, but I don't want to reserve it for any of the court's questions. Go ahead. Your Honor, this is the issue about personal use, which my colleague may raise in his last points on rebuttal. And, Your Honor, this was a new argument that plaintiffs, not plaintiffs, that the defendants did not tease out at the trial court level. They didn't elicit testimony about any personal use issues. It wasn't in any of the briefing that I could see. They didn't raise it to the trial court. What it comes is from language in the report for the first time on appeal. But it doesn't matter, Your Honor, because the court and Agent Otero didn't have to accept these innocent explanations under cases like Malik. There's no personal use talisman. And, Your Honor, my time's up. And in this case, the admission to having drugs in the car was enough. It had nothing to do with personal use. Your Honor, you would ask the court to affirm the trial court's ruling. Thank you. Thank you, counsel. Mr. Gomez, you have just over a minute. All right. A quick point about the artificial spray on mud. Counsel for the government said he didn't know whether it was geometry, physics, or common sense, and then explained that as you get further away from a car, you see more of the undercarriage. But this court need look no further than what Agent Otero said in his testimony, which is he said he saw the spray on mud in the adjoining lane while he was approaching. He affirmatively said he did not see it from several car lengths behind. And if he did see it from several car lengths behind, it raises the question of whether he was able to tell it was spray on mud at all. So what Agent Otero said was that he saw it from the adjoining lane to as he was approaching the car, which, as Your Honor pointed out, is impossible to see. And Otero said to himself he could not. Regarding the personal use amount of marijuana that Mario Marcial admitted to, this wasn't walking back anything. It was revealed in a series of questions that Agent Otero posed to both the Marcials. And in response to one of the questions, he said he had three grams of marijuana, which was a personal use amount. And the district court relied on solely that admission to support not only the prolonged stop, but the search of the car. So we ask that this court reverse the denial of the motion to suppress and remand with instructions to exclude the evidence. Thank you, Your Honors. Thank you, counsel. Thank both counsel for their helpful arguments, and the case is submitted.
judges: MILLER, COLLINS, Korman